Good morning. May it please the Court, my name is Roger Mast. I am counsel for the appellants who are the only two defendants in this case, Deputies Clark and Macias. This case involves a very unique set of facts, so unique in fact that the District Court referred to them as bizarre circumstances. And indeed they are, and they are a perfect example of why each one of these cases must be viewed on its own merits, close analysis of the facts and not in a mechanical fashion. When we engage in a mechanical analysis of the facts, then I submit that we're bypassing the standards that have been set forth by the U.S. Supreme Court to look at these saucier matters, qualified immunity and probable cause. I'd like to, I will reserve some time, hopefully, towards the end for rebuttal. I'd like to address the development of probable cause in this case for Clark and Macias and as well, of course, using the same facts, the issue of qualified immunity within the context that, of course, we don't evaluate the facts as to whether or not the case is going to be proven in court. That's not the purpose of what the deputies are doing there. It's as they're progressing, as they're developing the matter, is there probable cause as defined by the court. Under the totality of the circumstances, would a prudent person have concluded that there was just a fair probability that this defendant had done something wrong, committed a crime? The facts in this case, and, of course, in the context of summary judgment, looking only, there may be factual disputes. The issue is whether or not they're material to the extent that they would affect adversely what the deputies have done. And this, of course, involves the additional rather interesting factor of Deputy Clark, whether he would be viewed as a civilian-type witness as such or law enforcement officer. And frankly, we don't care which way it comes out because we think that he would be all right either way. Let's closely evaluate the facts because, as I said, they are unique. Deputy Clark and his adult son, Scott, lived right next door to the grandmother and mother-in-law. They had lived there for five to seven years. So already we're seeing a distinction from the types of cases where you have just some eyewitness who reports something to the police, who may have some ulterior motives or whatever else. They had lived there for five to seven years. Importantly, they knew that she was gone on a cruise. Even more importantly, she had specifically asked them to keep an eye on her property. Additionally, the attack room, which is where the burglary was committed or arguably committed, was some 100 to 125 feet off the road in this rural area. This sounds like a good jury argument, but you are here, are you not, in order to get us to reverse on a question of law? Yes, exactly. So can you – what is it? The issue, Your Honor, is that in order to not mechanically apply the facts, these facts show that under the totality of the circumstances, these officers had, number one, probable cause under these facts, and number two, certainly qualified immunity. If we were to mechanically apply the facts, the Arpen case – When you say mechanically, are you saying by the standards of summary judgment? No. Because we have to assume the plaintiff's facts, if they're in dispute, are correct. If they're material. Right. And they're not speculative. So he says he didn't get out of the car. Yes. And if – and so theoretically, if there were a civil action – If we assume that's the case, then what's the probable cause? If I may progress. The TAC room is well off the main road. The first eyewitness who reports this to law enforcement, if you will, the reliable informant, is the adult son, Scott Clark. Scott Clark reports to his father. Now, whether or not he's right, we don't know, and it doesn't really matter insofar as the actions of what follow concern. He reports to his father, obviously concludes that his son is a reliable source. Dad, there's someone in Grandma's shed and she's taking some things out. Mr. Prescott, let me – I take your point that they had a witness tell a deputy, tell another deputy that they saw somebody enter this lady's TAC room and take some property from it. Or at least exit from it. Yes. And you say you saw him carrying something out of it? Yes. Okay. So even if the – even if the person who stopped says, I didn't do it, the issue is not whether the person said, I didn't do it, but whether the officer had reason enough to investigate. Exactly. Okay. But then it doesn't sound like they really investigated. I couldn't hear you. But it doesn't sound like he went the next step to did, in fact, investigate. But he did. Did he go back and see if any property was missing? It wouldn't matter. Because a property – Well, if a guy says, I saw him taking property out and there's no property missing, that would cast doubt on the account, wouldn't it? No. Because, remember, what happened next is the adult son went into the house, which is a break in the proceedings, if you will. During that time period, Mr. Medeiros could have put the device, whatever he had taken, said, oops, I'm caught, I put it back. Remember, the burglary doesn't involve a taking. Burglary is the entry. That's true. But if he says, I saw the man leave this place with a saddle. He didn't say that. What did he say? He said that he saw – he believed he saw him take something out. Looked like a saddle? He thought it was a saddle. Okay. Now, if you go back and you see no saddle missing, wouldn't that cause you to kind of question the report? No. It means that the thief put it back because he knew he was discovering it. There's no evidence that he went back to the place. No. Well, what you have, Your Honor, this is my point. No, no, seriously. Is there any evidence? Seriously. I mean, now you're completely losing me, I have to say, because we're – you're asking us to speculate on summary judgment when we have to take all the inferences the other direction. And I realize at trial these are things you're going to talk about, but you have to persuade us based on the undisputed facts that your clients are entitled to qualified immunity. The – well, we're still dealing with the probable cause and as it's building the qualified immunity as well. But the point, Your Honor, is then when Scott went inside and got his father, the father then came out to further investigate it. And what he sees is, as a law enforcement officer, a 602N in effect, that is, that this person is leaving the premises where he wasn't supposed to be. This is a perfect example of why the legislature – I'm speculating on this – but why the legislature enacted 602N. When somebody's on somebody's property, not supposed to be there, why are they there? Maybe you can't prove the burglary. You can't prove the theft. But you have no business being there. And that's a misdemeanor. And that alone is probable cause to arrest. Right. You know, I'm from Arizona. I'm not from California. But it's not a crime in Arizona to go up to somebody's door and knock on the door. Well – Is that against the law in California? Well, 602N is actually quoted in the brief, Your Honor. And 602N makes it illegal to drive any vehicle as defined by 670. And this would come under that. Upon real property, occupied another, known not to be open to the general public without consent of the owner or possessor. Are you telling me if I drive to your house, drive into your driveway to knock on your door to – If you're – yeah. If you're coming 100 feet – Is that against the law? If I live in a rural area, if I'm living on a little ranch out in the middle of nowhere and you're coming onto my property, number one, my dogs are likely to get there. I can't drive onto your – I can't enter your driveway to raise money for the Boy Scouts or sell Girl Scout cookies or something like that? No. That's for direction. You may disagree with me, Your Honor, but that's the law that the legislation created. That's the law in California. You can't enter somebody's property to call on someone? And the exception – no. It says, known not to be open to the public, which this obviously isn't. And it also says without the consent. And there's an exception to that for a service process. So whether or not – Let me stop you right there. This argument wasn't made to the district court, was it? Your Honor, the issue of – Just start with the yes or no, and then you can – The 602N was not made to the district court. The issue of probable cause was made to the district court. The district court itself brought up the other issues of what other crimes might have been committed, and as the Court's aware, of course. If there were – if there was probable cause of qualified immunity for any crime that could have been committed, then the deputies are protected by at least qualified immunity. Right. But the district court didn't rule on that basis, correct? They did not rule on that basis. And the district court hasn't considered this specific argument. I'm sorry. The district court has not considered this specific argument, true? No, it did. To the extent that it considered probable cause and other crimes that theoretically could have been committed, it did. So the actual consideration is a no. Yeah. Can you point me to a place in the record where you raised this argument and the district court considered it? No. I'm saying 602N itself was not specifically mentioned in the argument. Yeah. Okay. Okay. But the idea of probable cause was and other crimes were. In fact, the Court mentioned it itself in any event. And further, I think it's appropriate even so. It's raised by the issue sufficient, I believe, that it may be argued on appeal. It was in the opening brief. It was in the reply brief as well. Right. The question is whether we can consider and should consider an argument raised for the first time on appeal. And this specific argument wasn't raised before the district court. That's up to us. It would be discretionary, except I think if the claim were different than it couldn't be, I think that a similar, a new argument expanding on the facts and the arguments made below is probably raised on appeal. Was there a warrant for the arrest? I can't hear you. Was there a warrant? I'm sorry. Was there a warrant for the arrest? No. No. And the arrest wasn't for trespass or driving into somebody? No. It was not. But as the law is very clear, it doesn't have to be. Qualified immunity was designed to protect people who have to make the quick decisions. It's not designed to be a gotcha. You goofed up in this little bit here, so we're not going to. Why did this require a quick decision? I'm sorry. Why did this require a quick decision? Was there a shootout or something like that? No. This guy was suspected of taking a saddle that turns out not to have been missing. What was the emergency? Well, any time an officer is in the field, he's got to make a decision. You're right. It wasn't a shootout and it wasn't a use of force issue. I mean, I suppose he could have written it up and then sent it to the prosecutor and say, do we have enough to get a warrant? A warrant for his arrest. Right. Theoretically, he could have, but he's not required to, nor would necessarily any reasonable officer. And you said he had to make a split-second decision. I don't see the need for a split-second decision in these circumstances. It's not split-second to the extent of am I going to shoot this guy or not. That's true. Still, it's one of the thousand decisions that an officer has got to make on the field as his day is progressing. And there was problems. I mean, he saw a 602N straight there. And then he did do first-world problems. And, by the way, that would corroborate what his son had seen. Okay. Putting yourself in the position of the officer, you have one side of this saying, I saw the guy coming out of the attack room, looks like he's taking something that doesn't belong to him. Right. The other guy says, I was just there asking for directions. What should the officer do at that point? Arrest him for burglary, or should he make some other further inquiry, or what? He should make, it would depend on the facts. Well, those are the facts. Well, the facts, it depends on the source of his information. And then he would do further investigation. It seems to me on those facts, if you have one guy saying, I saw him carrying something out of the attack room, the other guy saying, I was just there asking directions, and there's really no way to tell one way or the other, the logical thing to do would see if there's anything missing from the attack room. That would seem like that's the first thing you'd want to find out before you start arresting somebody. Well, what this officer did, that may be what one reasonable officer would do, but another reasonable officer would follow him, as Deputy Clark did. Right. Ask him what was going on, and then he was threatened by him, which is a 148. He denied it. He said, show me your ID. And then they both called the sheriff's office. I mean, this is the part I find a little, maybe not strange, but, I mean, usually people who are burglarized at home aren't going to call the sheriff's office and say, come on, get out of here, there's this guy harassing you. I've got to tell you, this is beyond the scope of the record, but I've got to tell you, Your Honor, I did a lot of criminal defense in my time, and we used to call it the big lie. You know. But here we are. We have to draw the inferences in favor of the plaintiff at this stage. Even drawing the inferences in the favor of him, you saw 602N, then a 148 follows when he does make inquiry. He knows, or reasonably should know, which is a requirement under 148, knew or should have known that he's a law enforcement officer. He's identified himself as such. He knows he is. And then he says he's going to kick his ass if he's accusing him. That's a 148A. Who identified himself as an officer? Clark. I thought Clark didn't have his ID with him. No, but he said, I'm a deputy sheriff. Okay. Well, I'm the Prince of Siam, you know. He said, show me your identification, and the deputy said, I don't have my identification with me. And he said, you don't have your identification, you're just Joe Blow off the street. Isn't that what he said? He did. And he assumed the risk. And it's true. He didn't have any identification. He didn't have it with him. He had it back at his house. Well, that doesn't help him there in the field if he's got it back in his kitchen, you know. Okay. I believe under 148A, that is sufficient for the offense, and the jury instructions would show that. It doesn't specifically say. The offense. If he knew or should have known that he's a deputy sheriff, then the offense is complete. Which offense? 148A. Which is? Resisting or interfering with an officer. How is he supposed to know? How is he supposed to know he's an officer? How does he know? He told him. Well, so what? Anybody can tell anybody anything. That's why they have badges and uniforms. I suppose so. And I guess if he wasn't a policeman, then he wouldn't be facing or shouldn't have faced 148A. Was he in uniform? No. Did he have any ID on him? No. He did not. No badge? Correct. No police car? Correct. He could have said I'm the FBI director. He could have said I'm the head of the CIA. How are you supposed to know? I think that's the risk you take, Your Honor. But in any event, you don't say. Whose risk? I'm sorry? Whose risk? Well, I think when an officer who's on duty 24-7, in effect, which California recognized, and I understand you're from Arizona, if he's on duty and he's saying this is what you've got to do, then if you say kiss my ass, then you're taking the chance that he's not or he is. But in any event, all of this is clarified when Messiah shows up. Okay. Your time has expired, but we'll give you a couple minutes for rebuttal. Thank you. Yeah. Good morning, Your Honor. My name is Steve Solano. I represent Mr. Medeiros in this action. This is my first time in 34 years as a lawyer that I've been to this court. Well, your luck has run out. It looks like. This close from a claim to the law. Yes. I'm also a 70% disabled Vietnam veteran, and I must say that this makes me as nervous as some of the other things I have said just to be up here. But to respond, Your Honor, Mr. Medeiros is an elderly gentleman. If you looked at my brief, you looked at the picture of him wearing that cowboy hat and all that. He's a very strong-willed individual. And what happened in this case is basically he felt he was very wronged. He became very angry. His belief in the country and all of those things make him very conservative. He's a rancher. His son's a police officer, actually a sheriff's sergeant in Merced County. And he just went to the wrong house. A friend called, told him, Sonny Rose moved down the street from you someplace, and would you go get his phone number for me? A person he knew had passed away and lived at the Cohen residence. He just went there. He just assumed that was the place. That was not the place. So he turned around and left. From that hill, he saw where some equipment was. The guy was supposed to be some sort of contractor or something like that, that he was going to see Mr. Rose. And so he drove to that residence. Was actually speaking to the individual when Deputy Clark showed up in civilian clothes without identification and tried to show, stated he was a sheriff's officer, and that's when the question came that. Show me ID. Show me a badge. And he didn't have either one of them. Was told he was Joe Blow. And apparently, Mr. Medeiros thought that as getting angry, because when he told him he was Joe Blow, he took a couple of steps back. Mr. Medeiros says, well, I'm going to go call the sheriffs and get this straightened out. Mr. Sloan, let me ask you this. There are a number of factual disputes here, but there are some facts that are not disputed. There's no dispute about the fact that Medeiros drove onto this property that he had no actual business being at, right? There's no dispute that the junior Clark said to senior Clark, I saw him going into the tack room and I think I saw him taking something out. Yes. No dispute that that happened. That is true. There's no dispute about the fact that they tracked down Medeiros. And sure enough, they confirmed that Medeiros was indeed at the property where the son said he saw him, right? Yes. Okay. And there's no dispute about the fact that senior Clark told the other officer, Macias, that all of this occurred. That is true. Okay. Now, when you add all that together, my question to you is, even if they've made a mistake, qualified immunity protects them from mistakes. That's the whole point of qualified immunity. They can make mistakes if it's a reasonable mistake. If you add all these undisputed facts together, why didn't they have at least a good faith belief that a burglary had occurred? Well, number one, he has to investigate the facts that were told to him because of the hearsay statement. I think that's a given under the law. He conducted no investigation that was a hearsay statement. What was the hearsay statement? The junior tells the deputy father, I saw him do it. You know, I saw him, I made these observations. Yeah, but the deputy father didn't make the arrest. Well, so what? Under the collective knowledge doctrine, what you tell one cop applies to all the cops. Well, I believe that that's not the case here. I think that an officer can wear two hats, one as a citizen informant, and that citizen informant told Sheriff's Officer Macias what his son had said. I believe, however, when he went down and saw Mr. Medeiros at that Cohen residence, then he was wearing his officer hat because he identified himself as a sheriff's officer. But nowhere did it show up to that point in time that you're talking about where Deputy Clark conducted any investigation himself. What he did was heard what his son has told him and relayed that to Deputy Macias. So I don't think that in and of itself constitutes probable cause. Even if it doesn't, isn't it a reasonable mistake? Failure to investigate I don't think is a mistake. And we're talking about rights here. And along those veins, the arrest itself, whether there's probable cause or not, may not be an issue. The arrest took place after your client had said that he didn't do it, that he hadn't taken anything? I'm sorry, Your Honor. I'm sorry. The arrest took place after your client had said that he hadn't taken anything? Yes. Yes. He had already said that. The police had before them the statement of the boy, that he saw him take something, and your client's statement that he didn't take anything, that he was there for something else. Yes, Your Honor. I was working on this over the weekend. And on Saturday evening, I located a case that was heard by this court in February 8, 2013, called Ford v. City of Yakima. Is the court aware of that case? And its site is 706 Fed Third, 1188. In that case, a gentleman was driving down the road with music coming from his car. He was black. An officer got behind him. The man changed lanes. The officer changed lanes with him and had a stop sign. The man's angry, gets out of his car, walked back to the officer, and kind of challenges him saying, what are you following me for, and things like that. The officer said, get back in your car. He got back in his car. Officer hit his light, stopped him, gave him a ticket for too loud music. Apparently, the man was, let me strike that. The complaint issued, see, tell them, I'm nervous here. This, the man filed an action for freedom of speech because the officer told the man several times that shut up and things like that, and he made a retaliatory arrest. And in this freedom of speech issue, which, by the way, is also one here, I just hadn't thought of it, because my guy was basically in his retaliatory arrest because of his actions, saying if you accuse me of being a thief, I'll kick your ass and things like that. I hadn't thought about it. Whether I'll amend, I don't know. So what happened? In this case, did they deny immunity to the officer? No. If I may, what it says here is that the police officer had probable cause for arrest because of the music. But a police officer's probable cause for arrest does not preclude determination that the officer had a retaliatory motive that was the but-for motive for the booking and jailing of Mr. Ford. So what this case says is that it doesn't matter if there's probable cause. Have you argued that this was a retaliatory? It's a retaliatory. It's all through my complaint. I said it was for punishment for the way he acted, and that's basically what this is. I just didn't use the correct word, retaliation. And if that's the case, and if you look at Ford v. City of Yakima, you'll see that the facts are similar in that you get in an argument with the police officer, what the hell are you doing, Chase, pardon me, following me so close, and then get stopped and pulled over and arrested. Let me ask you, I'm not clear what happened after the arrest. Did they charge him with trespass? First-degree burglary. And did he do a deferred prosecution on trespass or something? Yes. It was eventually almost dismissed, not actually. It went on for a long time. They charged him with first-degree burglary, then reduced it, which is mandatory, four years in prison in California, and then eventually reduced it to misdemeanors and he wouldn't plead to anything. He's so angry, and what happened was that the DA finally says, well, if you agree not to drive up to the Cohen residence again, we'll dismiss the case. And so they made that, that he couldn't drive up there for a year, and a year later they dismissed the case. And so we had one motion on that, but the court ruled that he wouldn't be convicted of anything. Well, you know, if this were a court of blame instead of a court of law, I'd say there's a fault on a lot of sides here, which leads me to wonder, at the end of the day, I mean, your client is angry about this, and I understand that, but I'm not sure eventually that this is a case that should go to a jury trial. Have you considered settlement or the assistance of our mediators in resolving this dispute? I don't know if a defendant would go to mediation. I know he denied it at one time when the mediator had called, but, yes, I would try to resolve it if at all possible, but. That's a great idea. Your client would be amenable to pursuing it, talking to the mediators? Oh, yeah. Yeah, he would. But the. . . Have you talked about settlement at all? No. No, we have not. The issue, you take my client's version of facts as being true, and that means assuming that Yakima is not going to apply here, and assuming. . . Well, you haven't pled the Yakima facts yet, so. . . You haven't pled the theory of retaliation yet, so. . . No, I. . . So we're not going to consider that on appeal, although we take it as background information. I understand why you mentioned it, but. . . Okay. Well, I take it your position here so far as you were arguing in the district court is that if your client said he didn't do it, was there by mistake, and the officer says that the boy said that he had taken something, that there was a duty to do some further investigation, which wasn't. . . Well. There wasn't probable cause with that. Yes. Conflict. It would be very simple for Officer Macias to go down and check if the Marks and Prints were at the Cohen residence, if there's goat heads there, talk to the guy there to see if, in fact, Mr. Cohen was there asking for the phone number of Sonny Rose. It would have been simple if the officer could have telephoned Mr. Melvin, I can't remember his name, I think that's it, and asked him, did you have Sonny Rose go over and, I mean, have Mr. Dares go over and try to find Sonny Rose. That would be easy for him to do. He could do it right there within half an hour. Right. So, and the district court said you were right, that given that conflict that there wasn't probable cause. Right. Right. With those. At least accepting everything that you have alleged. With those evidences, yes. And then for the trier fact, and a reasonable jury could certainly find that that was the case. Okay. Any further questions? Thank you. Thank you for your presentation. Okay. I'll give you a couple minutes for rebuttal. Justice Silverman, I was actually going to address some of the issues that you were, of course, asking questions about, and that's the issue of qualified immunity. The counsel brought up the issue of investigations. As I distinguished in our briefs, the issue of investigation is designed to make sure you don't have some kind of a, not only to make sure you have probable causes of some sort, but especially because you're trying to corroborate or show if there's some phantom witness out there. You're trying to protect against that. In the case of the district court. I don't understand that. What if you have, in this case, if you have two versions of what happened, the district court, what did the district court do wrong? Just explain. If you were writing this in a sentence as to what the district court did wrong, what would it be? I think the biggest problem is when the court changed what it said, an oral argument, where there was probable cause, how could you not say Macias could act on what he said? It was at least qualified immunity for him and there's probable cause. And then in the written decision, completely different point of view.  I mean, the district court asked a question of defense counts of the, of your adversary as to how could you not say that was probable cause. And you say that that shows that the court was being inconsistent. I think he was, I'm sorry. Is that, is that what you're saying, the court was inconsistent? I don't. It's not that it's inconsistent. I'm whining and complaining, gee, why did you change what your obvious decision was. And it wasn't just commenting or asking questions. If you read the transcript and it's provided, it was very clear. There's probable cause here. How can you, or even more significantly, in view of what the Court's position apparently is, how could you say there isn't qualified immunity under these facts when the son of. I'll tell you how, because you have a he said, he said, and you can't really tell who's telling the truth without doing some further looking into it. Things that were easy to, easy to, to do. All of the points that, that Plaintiff's counsel, Mr. Solano, brought out as to some other further investigation were specifically addressed in the brief. They would have made no difference. How can a deputy, Macias, not rely on what he's told by a fellow deputy that shows a burglary, probable cause for a burglary? And again, he may not be guilty, but he's got testimony from a, not testimony, he's got information from a reliable source about the entry on the property, which is a 602, which the officer also witnessed himself corroborating what the son had said about the entry. Again, the burglary. There is no contrary information. There is no contrary information on a material fact, because there's no question that he was on that property. There was no question that he had no permission to be on there. There's no question. He even said, Madero said, maybe he misconstrued something I did when I got off the vehicle as coming back. Okay. Let me ask you a separate question before you're a little over your time. Under our case law, a decision that there are genuine issues of material facts is not appealable. So then I gather that the only question for us is if, as you say, the facts are material or not. True. Because if we determine they are material, then we have no jurisdiction over this appeal, right? However, appellate courts are also clear, including this appellate court, that you can at least affirm, on any ground supported by the record and the underlying substantive law determines what's a material fact. Right. If there's an issue as to the inferences to be drawn, that's an appealable issue of material fact. Okay. And the misapplication of the laws. Yeah. No, I understand that. I'm just saying. Judge Wanger found that there were genuine issues of material fact. Straight up, that's not appealable on an interlocutory basis, and the only question for us is whether or not those issues are material, whether or not he made an error of law, right? Yes. Okay. Thank you both for your arguments. May I just ask, Judge Thomas asked Mr. Solano about whether mediation might be useful here. Would you be willing to talk to them? I'm always willing to talk to my old friend, Mr. Solano. Very good. Thank you both for your arguments. The case has now been submitted and will be in recess for the morning.
judges: Schroeder, Thomas, Silverman